[No. 3394. Decided February 15, 1900.]

THE CITY OF SPOKANE *et al., Appellants,* v. THE AMSTERDAMSCH TRUSTEES KANTOOR, *Respondent.*

CORPORATIONS—DE FACTO TRUSTEES.

A board of trustees of a corporation have capacity to transact corporate business, when the trustees who assume to act are at least *de facto* officers, and have been recognized by the company and the public as such trustees.

SAME—PLEDGES OF STOCK—VOTE OF OWNER BINDING ON PLEDGEE.

The owner of stock in a corporation, although he may have pledged it, is still competent to represent the stock at corporate meetings and vote as a shareholder; and his action is binding on the pledgee.

SAME—STOCK SUBSCRIPTIONS—CAPACITY TO DO BUSINESS.

Although a corporation may not have complied with the statutory requirement that all of its stock must have been subscribed before it can do business as a corporation, yet where it has done business without fully and fairly complying with such prescription, the question cannot be raised, either by the corporation, or one dealing with it, to the injury or loss of other parties.

SAME—ULTRA VIRES.

Where a corporation has received benefits under a contract it is estopped from saying that the contract was *ultra vires*.

Appeal from Superior Court, Spokane County.—Hon. WILLIAM E. RICHARDSON, Judge. Affirmed.

*Cyrus Happy, A. G. Avery, Wm. T. Birdsall* and *Samuel R. Stern (Happy, Hindman & Langford,* of counsel), for appellants.

*Graves & Graves* and *Binkley & Taylor,* for respondent.

The opinion of the court was delivered by

REAVIS, J.—Suit in equity by stockholders of the Spokane Falls Water-Power Company to set aside a conveyance of all of the property of that company to the Northwestern Milling & Power Company, a corporation, and also to cancel a mortgage and vacate a sale under foreclosure thereof made by the Northwestern Milling & Power Company to the respondent the Amsterdamsch Trustees Kantoor. The complaint alleges matters and things which appellants claim show that the transaction which transferred the title of the property owned by the power company to the milling and power company was *ultra vires,* and that the persons acting for the power company in the transaction were not authorized so to act; that neither the milling and power company nor respondent was competent to take title to the property, and that the deed to the milling and power company was never delivered; and it was alleged, also, that there was fraud, both actual and constructive, in the transaction. The Spokane Falls Water-Power Company is a domestic corporation organized in January, 1889, with a capital stock of $500,-000, divided into 5,000 shares of the par value of $100 each. The objects of the corporation, as expressed in its articles, were:

"To buy, own, sell, lease, improve and deal in real estate, water power, water-power privileges, sites and franchises, mill and manufacturing sites and privileges.   To erect, construct, own, operate and maintain mills, manufactories, canals, aqueducts, flumes, dams, warehouses, offices, bridges, piers and structures as may from time to time be deemed necessary or for the best interests of the corporation· upon its own premises, or upon premises leased or otherwise acquired by it, in the county of Spokane, Washington Territory.   To do and transact a general milling and manufacturing business in the county of Spokane, territory of Washington.   To lease, mortgage, sell and convey the whole or any part of its property.   To borrow money on the·bonds, notes, bills of acceptance, or otherwise of the corporation, upon such terms and for such time, and upon such rate of interest as the board of trustees may determine, and to secure the payment of the same by mortgage upon the whole or a part of its property, real, personal or mixed, or by such other means as its board of trustees may deem expedient.   To loan its own money or to dispose of, sell, or convey its property, upon such terms, and for such rate of interest as the board of trustees may deem expedient, and to receive therefor such notes, mortgages or other evidences of indebtedness as its board of trustees may determine."

The corporation had never done any business except to acquire title to water-power property and real estate connected therewith, and to lease, manage, and sell the property as opportunity offered.   The Northwestern Milling & Power Company was a domestic corporation, with its principal place of business in the city of Spokane.   The objects of its incorporation, as stated in its articles, are:

"To buy, own, operate, control, lease and sub-let water power, water-power sites and franchises; to own, operate, control, lease and sub-let, build and construct flouring mills, cereal mills, lumber mills and manufactories, linseed oil mills, tanneries and· manufactories of all kinds and nature; to build, construct, own, operate, control, lease, and sub-let electric lighting, electric heating, electric

power plants, electric street, passenger and freight railways; to deal in any and all kinds of merchandise; to loan money upon real estate or personal property, bond or mortgage or other evidences of indebtedness; to borrow money upon the obligations of the corporation either upon its property in whole or in part, upon bond and mortgage or by issuance of bonds or upon other evidence of indebtedness; to build, construct, own, operate, lease and sub-let dams, booms, piers, canals and waterways."

The respondent the Amsterdamsch Trustees Kantoor is a corporation created under the laws of the kingdom of Netherlands, with its office situated in the city of Amsterdam. The objects of its incorporation are the promoting of Dutch financial interests in the kingdom of Netherlands and without, in the widest sense of the word; and such corporation had complied with the laws of this state qualifying it to do business here. It appears substantially from the findings of fact and the evidence that the power company and the shareholders thereof were desirous to sell all the property which it had acquired, consisting of water power and real estate connected therewith; that, pursuant to the request of its trustees and shareholders, various options had been given to agents to sell the property, and resolutions had been adopted, at meetings where all the shares of capital stock were represented, to sell the property. After various negotiations, extending through several years, and no sale having been effected, the persons chiefly interested in the company concluded to form another corporation, and did so form the Northwestern Milling & Power Company. It seems fairly deducible from the record that the power company, then owning valuable water power and the real estate connected therewith, was yet realizing no income from such properties; that it had made no development; and, while it had incurred no debts, yet the fixed charges for taxes and other expenses connected with the management of the property required some

income; and that it was deemed by the shareholders generally and the trustees that the new corporation formed could purchase the property of the power company, and procure money to develop the same, and make it income-bearing. Accordingly, at a meeting where all the shareholders were represented, the trustees of the power company were authorized to sell all its property to the Northwestern Milling & Power Company for the sum of $400,-000, $150,000 to be paid in cash and $250,000 in shares of stock in the Northwestern Milling & Power Company, and the president and secretary of the board of trustees were authorized to execute a warranty deed conveying the property to the Northwestern Milling & Power Company for the consideration mentioned. On the same day a meeting of the board of trustees of the power company was held, and a similar resolution was made, directing the president and secretary to execute the deed, and the deed was thereafter executed in accordance with the resolution, and under the corporate seal of the company, and delivered. Immediately thereafter the Northwestern Milling & Power Company executed and delivered its mortgage upon the same property to the respondent. The mortgage was to secure the sum of $300,000, which was loaned by respondent to the Northwestern Milling & Power Company. The respondent, in making its loan to the milling and power company, was acting solely as trustee for its bondholders or certificate holders. Early in 1896 the Northwestern Milling & Power Company having made default in payment of the indebtedness evidenced by the bond and secured by mortgage to respondent, respondent commenced proceedings to foreclose the mortgage in the superior court of Spokane county, and on June 3, 1896, a decree of foreclosure was duly entered therein ordering the sale of the property to satisfy the sum of $316,631.90, with interest at the rate of six per cent. from the date of

decree, and thereafter the sheriff, on the 10th day of July, 1896, sold said property, and respondent, being the only bidder, purchased the said property for the full amount of the debt owing to it at the time by the milling and power company; and on the 9th day of November, 1897, a deed was properly executed by the sheriff of Spokane county to the respondent, and the respondent has been in the possession thereof since the 10th day of July, 1896.

1. The record here is a large one, and from the examination given it the conclusions of fact found by the superior court are approved. Allegations of actual fraud are not sustained by the evidence. The original corporation, the power company, had but few shareholders. Some half dozen persons seem to have contributed to the original capital stock. The books of the corporation were informally kept. There were but few meetings of the stockholders, and most of the meetings of the trustees were informal. The capacity of the board of trustees to meet and act at the time the sale of the property was determined upon has been vehemently questioned by counsel for appellants, but it is apparent that each of the trustees assuming to act at such meetings was at least a *de facto* officer, and had been so recognized by the company and the public as such trustee. The trustees were evidently holding under color of title, and were held out as such officers. It may be well to observe here that none of the appellants were shareholders of the power company at the time of the sale. They were pledgees of its capital stock, respectively pledged to each of the appellants by individual shareholders, and there seems to have been no notice of the pledge of stock given to the corporation. The owner of such stock, although he may have pledged it, is still competent to represent it at corporate meetings, and vote as a shareholder. Bal. .Code, § 4264, and also 1 Thompson, Corporations,

12—22 WASH.

§§ 732-735. And the action of the owner of the stock at a corporate meeting is binding on the transferee of its shares. Cook, Stock & Stockholders (1st ed.); § 687; *Kent v. Quicksilver Mining Co.,* 78 N. Y. 159; *Leathers v. Janney,* 41 La. An. 1120 (6 South. 884, 6 L. R. A. 661). Some of the corporate shares were represented by executors at the shareholders' meeting. This is authorized. Bal. Code, § 4263. The appellants, as pledgees, must stand in the shoes of the owners of the shares under the circumstances which are shown here. The sale contemplated from the power company to the power and milling company appears to have been open and notorious, and pending for a long time. No objection was made by any of the appellants. The minutes of the sale from the power company to the milling and power company showed apparent regularity in the authority of the trustees and the proceedings of the shareholders in making the sale and conveyance of the property. It is also urged by counsel for appellants that the milling and power company was not properly constituted as a corporation to do business, and hence could not take the title to the property from the power company, for the reason that its capital stock was not subscribed in good faith. It is not considered material to inquire into the evidence of good or bad faith in the subscription to the capital stock of the milling and power company. In *Carroll v. Pacific National Bank,* 19 Wash. 641 (54 Pac. 33), it is said:

"And, while there was no formal subscription of the capital stock of the corporation, yet it was, at any rate, duly formed, and the legal restriction prescribed in our statute is against its doing business until such stock subscription is made. But, having done business, the question cannot be raised, either by the corporation or one dealing with it, to the injury or loss of other parties."

2. But the main contention of appellants is that the power company could not make the sale of all its property

to the milling and power company; that such action was
*ultra vires,* and therefore void, even against an innocent
purchaser; and this is the material question here. The
general proposition stated by counsel, "the powers of a cor-
poration organized under the legislative statutes are such,
and such only, as the statutes confer," may be conceded as
a correct statement of the law; and the further principle
that "a contract not within the scope of powers conferred
on a corporation cannot be made valid by the assent of
every one of the stockholders" may be approved. In the
case of *Oregon Ry. & Nav. Co. v. Oregonian Ry. Co.,* 130
U. S. 1 (9 Sup. Ct. 409), the court had under considera-
tion the constitution of Oregon (article 11, § 2), similar
in its declaration to our constitution, providing,

" Corporations may be formed under general laws, but
shall not be created by special laws, except for municipal
purposes ;"

and it is observed:

" Outside of the powers conferred and the privileges
granted to those organizations by the statutes under which
they exist, they are in all of the states of the Union which,
like Oregon, have the common law as the foundation of
their jurisprudence, governed by that common law; and
it is the established doctrine of this court, and, with some
exceptions, of the states in which that common law pre-
vails, as well as of Great Britain, from which it is derived,
that such a corporation can exercise no power or authority
which is not granted to it by the charter under which it
exists, or by some other act of the legislature which granted
that charter."

See, also, *Thomas v. Railroad Co.,* 101 U. S. 71.

It may also be further observed that a corporation can-
not enlarge its powers beyond legislative grant by any
statement in its articles of incorporation. The corporation
may be differentiated from the natural person thus: The
natural person may make any contract or do any business

not inhibited by law or public policy. The corporation cannot make any contract or do any business except as authorized by legislative grant. But it will be observed in each case from the supreme court of the United States, *supra*, there was an endeavor made to enforce a contract which was *ultra vires* corporate authority. But in *Thomas v. Railroad Co.* the court cited with approval *Parish v. Wheeler*, 22 N. Y. 494, to the effect that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it. It seems that the rule stated in *Parish v. Wheeler* has been applied by this court, and where a corporation has received benefits under a contract it is estopped from saying it has no power to make it. *Tootle v. First National Bank*, 6 Wash. 183 (33 Pac. 345); *Wheeler, Osgood & Co. v. Everett Land Co.*, 14 Wash. 633 (45 Pac. 316). The respondent loaned $300,000 to the Northwestern Milling & Power Company. The Spokane Falls Water-Power Company received the consideration for its property. Respondent duly foreclosed its mortgage, and under a decree received its title, and is in possession of the property by purchase. Certainly, under no known rule of equity can a court of conscience interfere to disturb its title.

The discussion by counsel of the distribution of the money paid on the purchase price to the power company by the milling and power company has not been unobserved. It seems that a large sum of money was distributed by the power company among its shareholders, and also that 2,500 shares of stock in the milling and power company were distributed among the shareholders of the power company. However unlawful such action of the officers of the power company may have been, it does not affect the respondent here. No duty devolved upon it to follow its loan beyond the payment to its mortgagor, and a

shareholder of the corporation, or the pledgee, standing
in his place, who has received and partaken of the fruits
of such illegal distribution among the shareholders, cannot
very reasonably invoke equity to restore property when he
has a part of the money received for the property.

The judgment of the superior court is affirmed.

GORDON, C. J., and DUNBAR and FULLERTON, JJ.,
concur.